UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ENERGY LABS, INC. | ) |
| Plaintiff, | ) |
| v. | ) No. 14 C 7444 |
| | ) Hon. Marvin E. Aspen |
| EDWARDS ENGINEERING, INC. and W.E. BISHOP & CO. | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Court Judge:

This action arises from an alleged breach of a manufacturing contract. Plaintiff Energy Labs, Inc. ("ELI") brings its complaint against Defendants Edwards Engineering, Inc. ("Edwards") and W.E. Bishop & Co. ("Bishop"), alleging breach of contract, *quantum meruit*, and promissory estoppel. Presently before us is Defendants' motion to dismiss the complaint. For the reasons discussed below, we deny Defendants' motion to dismiss in full.

**BACKGROUND**

ELI is a California corporation that manufactures custom air-cooling and heating systems for commercial use. (Compl. ¶¶ 1, 7.) Edwards, an Illinois corporation, contracted with the Chicago Transit Authority ("CTA") to rehabilitate the air conditioning and heating systems at the CTA's 103rd Street repair facility ("CTA Project"). (*Id.* ¶¶ 12, 16.) Edwards also entered into a contract with Bishop relating to the CTA Project, although Bishop's role is unclear. (*Id.* ¶ 30.) ELI alleges that Bishop was Edwards' alter ego and merely acted as a "pass through," "performing no work" and "providing no services" for the CTA Project. (*Id.* ¶ 36.)

ELI alleges that Defendants certified to the CTA that any subcontractor they utilized for the CTA Project would comply with the Buy America Act ("BAA"). (Compl. ¶ 14.) The BAA mandates that certain components used to construct transportation systems funded by the federal government be manufactured in the United States. 49 U.S.C. § 5323(j); 49 C.F.R. § 661, *et seq*. After certifying that it would comply with the BAA, Defendants subcontracted with ELI to manufacture and deliver thirteen custom air conditioning units for the CTA Project and sent two purchase orders to ELI for that purpose. (Compl. ¶¶ 2, 16, 25–26.) According to ELI, the purchase orders do not reference the BAA. (Resp. at 9.) After receiving the purchase orders, ELI designed the air conditioning units, submitted those designs to Defendants and the CTA for approval, and started manufacturing the units in Tijuana, Mexico. (Compl. ¶ 17.)

On March 3, 2014, Edwards' Executive Vice President of Engineering toured the facility in Mexico where ELI was manufacturing the air conditioning units. (*Id.* ¶ 39.) At the time, Edwards' Vice President did not mention that the BAA prevented Edwards from using air conditioning units manufactured in Mexico for the CTA Project. (*Id.* ¶ 40.) Following this inspection, ELI was notified that the BAA governed the CTA Project.[1] (*Id.* ¶ 42.) ELI and Edwards then sought guidance from the Federal Transit Administration ("FTA") to determine whether the BAA precluded Defendants from using ELI's air conditioning units for the CTA Project. (*Id.*) The FTA found that it did, reasoning that the units were "components," rather than "subcomponents" as the parties originally argued. (*Id.* ¶ 43; Mot., Ex. B.) Under the BAA and its corresponding federal regulations, components must be manufactured in the United States, whereas subcomponents may be manufactured abroad. *See* 49 C.F.R. § 661.5(d)(2). (Compl. ¶¶ 43–44; *see* Mot., Ex. B at 3.) Since ELI's air conditioning units were "components,"

---

[1] ELI does not specify which individual or entity initially notified it of this problem.

2

they had to be manufactured in the United States if Defendants were to use them for the CTA Project. (Compl. ¶¶ 43–44; *see* Mot., Ex. B at 4.) Defendants then cancelled their purchase orders with ELI and retained a different manufacturer to produce the air conditioning units in the United States. (Compl. ¶¶ 45, 62.)

ELI filed a complaint with this court asserting breach of contract, *quantum meriut*, and promissory estoppel. It seeks damages totaling $952,415 for work it completed pursuant to the purchase orders from Defendants. (*Id.* ¶¶ 54, 64, 76, 82.) In their motion to dismiss, Defendants argue that the parties' contract cannot be enforced because it was contrary to the BAA and therefore illegal. (Mot. at 1.) Similarly, Defendants contend that ELI cannot recover in *quantum meruit* or promissory estoppel because a party cannot recover in equity on an illegal contract. (*Id.*) ELI disputes that the contract is illegal. (Resp. at 2.)

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is meant to "test the sufficiency of the complaint, not to decide the merits of the case." *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In evaluating a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).

A court may grant a Rule 12(b)(6) motion to dismiss only if the complaint lacks enough facts "to state a claim [for] relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949–50 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

3

alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. While a facially plausible complaint need not contain "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65. On the other hand, a claim is not plausible if the plaintiff has "ple[d] herself out of court [by including] in her complaint facts that establish an impenetrable defense to her claims." *Vinson v. Vermilion Cnty., Ill.*, 776 F.3d 924, 929 (7th Cir. 2015); *accord Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008). These requirements ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964.

## ANALYSIS

Defendants argue that ELI's breach of contract complaint should be dismissed because ELI's allegations demonstrate that the contract is illegal and thus unenforceable, and that ELI's equitable claims must likewise be dismissed because ELI cannot recover in equity on an illegal contract. We first address Defendants' illegality of contract arguments, and deny their motion to dismiss the breach of contract claim on that basis. Next, in light of our disposition on the breach of contract claim, we deny their motion to dismiss the equitable claims as well.

**I.    Breach of Contract Claim**

Defendants argue that ELI has pled itself out of court by alleging facts that establish their contract with ELI is illegal under the BAA. (Mot. at 1.) Principally, they contend that the BAA's strong public policy to "buy American" prevents enforcement of the contract. (*Id.* at 6–7.) ELI responds that the BAA does not apply to its contract with Defendants, and therefore the contract is enforceable. (Resp. at 5.)

Before we reach the merits of the parties' arguments, we first resolve their dispute over whether federal or Illinois law applies to determine the legality of the contract.

4

A.  **Choice of Law**

In support of their motion, Defendants cite Illinois law governing the illegality of contracts, while ELI contends that federal law applies. (*See* Resp. at 4–5; Reply at 8–9.) We agree with ELI but also recognize that neither party identifies any critical differences pertinent to the issues before us.

When a party asserts that a contract is illegal under a federal statute, "federal law determines not only whether the statute was violated but also . . . the effect of the violation on the enforceability of the contract." *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) (hereinafter [*NIPSCO*]); *accord Costello v. Grundon*, 625 F.3d 342, 360 (7th Cir. 2010), *vacated on June 16, 2011 on other grounds explained in* 651 F.3d 614 (7th Cir. 2011); *see Walsh v. Schlect*, 429 U.S. 401, 407–08, 97 S. Ct. 679, 684–85 (1977); *Kelly v. Kosuga*, 358 U.S. 516, 519, 79 S. Ct. 429, 431 (1959); *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176, 63 S. Ct. 172, 174 (1942). Since Defendants argue that a federal statute, the BAA, makes its contract with ELI illegal, we must apply federal law to answer both whether the contract violates that statute and whether the contract is enforceable.

The parties agree that under federal or state law "in general, a contract entered in violation of a statutory or regulatory law is unenforceable." *Comdisco, Inc. v. United States*, 756 F.2d 569, 576 (7th Cir. 1985); *see Costello*, 651 F.3d at 625. Notwithstanding, the Seventh Circuit has explained that even if a contract is illegal, it is not automatically unenforceable. *NIPSCO*, 799 F.2d at 273. Under federal law, the illegality of contract defense involves a balancing of the "pros and cons of enforcement," taking into account the benefits of enforcement "that lie in creating stability in contract relations and preserving reasonable expectations" and the "costs in forgoing the additional deterrence of behavior forbidden by the statute." *Id.*; *see also*

5

*Costello*, 651 F.3d at 624 (considering the "the public interest of deterring contracts in violation of the law and promoting adherence to the law"). Moreover, even if a contract is not itself illegal, "a court has the power to refuse to enforce [it] when enforcement would violate clearly articulated congressional goals and policies." *Costello*, 651 F.3d at 625 (quoting *Stuart Park Assoc. v. Ameritech Pension Trust*, 51 F.3d 1319, 1326 (7th Cir. 1995)); *see United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42, 108 S. Ct. 364, 373 (1987) ("[A] court may refuse to enforce contracts that violate law or public policy.").

Keeping these broad principles in mind, we consider whether ELI has pled a contract that clearly violates the BAA. Then, after determining that it has not, we discuss whether the purpose and policies of the BAA nonetheless require us to declare the contract void at this time.

### B. ELI Did Not Plead an Illegal Contract

Under federal law, contracts that violate a federal statute on their face are "intrinsically illegal." *NIPSCO*, 799 F.2d at 273. For example, express agreements to violate the law are clearly illegal—such as agreements to restrain trade or commit a bank robbery—as are agreements that explicitly contradict a federal statute. *See, e.g.*, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 78, 102 S. Ct. 851, 856 (1982) (finding the parties' agreement was illegal because it required the plaintiff to pay a penalty if it breached a separate agreement to restrain trade). In addition, even if the contract is not illegal on its face, courts have found contracts inherently illegal where one party must violate a statute or regulation to fulfill its obligations. *Costello*, 651 F.3d at 628 (holding that the illegality defense can apply to "cases where one party would have to violate a statute to perform its obligations"); *see In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 672 (7th Cir. 2013) (holding the defense of illegality was inapplicable where "[t]he contracts did not require either [party] to do anything illegal, nor did they encourage either party to engage in

illegal activity"); *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 980 F.2d 449, 455 (7th Cir. 1992) (suggesting a contract for hospital services might be illegal (although still enforceable) where the hospital was not properly certified under state laws). On the other hand, "the defense of illegality does not come into play just because a party to a lawful contract . . . commits unlawful acts to carry out his part of the bargain." *In re Sentinel*, 728 F.3d at 672 (quoting *NIPSCO*, 799 F.2d at 273).

Based on ELI's allegations, we cannot find that its contract with Defendants explicitly violates the BAA. To determine whether a contract violates a federal statute on its face, we compare the four corners of the contract with the language of the statute and related regulations and any interpreting case law. *See generally NIPSCO*, 799 F.2d at 273 (finding that a contract for the sale of coal was not illegal where the pertinent statute did not regulate the sale of coal). According to the complaint, the contract between Defendants and ELI simply requires ELI to manufacture and deliver, and Defendants to buy, air conditioning units for the CTA Project. (Compl. ¶¶ 16, 25.) The BAA does not outlaw all sales of foreign-made air conditioning units to local government agencies like the CTA; rather, it only limits the use foreign products in the construction of transportation systems that are funded by the federal government. 49 U.S.C. § 5323(j); 49 C.F.R. § 661, *et seq.* Neither party contends that the purchase orders ELI received from Defendants require Defendants to pay for the air conditioning units with federal funds or even indicate that the CTA Project is federally funded. In addition, ELI alleges that the orders do not reference the BAA at all. (Resp. at 9.) Since the complaint does not allege that the contract explicitly incorporates the BAA or even mandates payment with federal funds, we cannot find that it is intrinsically illegal under the BAA.

Moreover, enforcement of the contract would not necessarily require Defendants to violate the BAA. Simply because the Defendants *intended* to pay for the air conditioning units with federal funds, does not mean that the contract required them to do so. As we explained, the illegality defense "does not come into play just because a party to a lawful contract . . . commits unlawful acts to carry out his part of the bargain." *In re Sentinel*, 728 F.3d at 672 (quoting *NIPSCO*, 799 F.2d at 273) (finding contracts were not inherently unlawful because the defendants could have fulfilled their obligations lawfully, even though they chose to do so in an illegal manner); *cf. Costello*, 651 F.3d at 628 (finding that the defendants were entitled to pursue an illegality defense where "enforcing the parties' contract would appear to enforce the very conduct prohibited by the regulations" at issue). By paying for the air conditioning units with non-federal funds, Defendants can fulfill their obligations under the purchase orders without violating the BAA. Thus, as pled, the contract is not illegal.

In essence, Defendants' illegality argument is an attempt to impose their obligation to use American-made products under their contract with the CTA into their contract with ELI. However, the contracts are separate agreements, between different parties, and they impose different, albeit potentially conflicting, legal obligations. The fact that Defendants have subjected themselves to conflicting obligations does not make their contract with ELI illegal. *See W.R. Grace and Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum, and Plastic Workers of Am.*, 461 U.S. 757, 767, 103 S. Ct. 2177, 2184 (1983) (enforcing "two conflicting contractual obligations" where the party "committed itself voluntarily" to both).

    **C.**    **ELI Did Not Plead a Contract That Is Void under Public Policy**

Defendants rely heavily on the theory that contracts that undermine strong public policy should not be enforced. (Mot. at 6–7; Reply at 6–9.) In this vein, Defendants cite *G.L. Christian*

*and Associates v. United States*, 312 F.2d 418, 160 Ct. Cl. 1 (1963) and *S.J. Amoroso Construction Co., Inc. v. United States*, 12 F.3d 1072 (Fed. Cir. 1993) to support their argument that ELI's contract is unenforceable based on policies underlying the BAA.

Under the *Christian* doctrine, "a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." *Amoroso*, 12 F.3d at 1075 (citing *G.L. Christian*, 312 F.2d at 424, 427). Defendants contend that the BAA expresses a strong public policy to "buy American" such that its provisions should be included in the parties' contract by operation of law. (Reply at 6–7.) Defendants argue that this case is like *Amoroso*, where the Federal Circuit invoked the *Christian* doctrine to "read into" the parties' contract a provision from the Buy American Act of 1933.[2] The parties had entered into a construction contract whereby Amoroso agreed to build a commissary building in San Francisco for the Army Corps of Engineers. *Id.* at 1073. Under the Buy American Act, "every construction contract for public buildings and works 'shall contain a provision that in the performance of the work' only American materials will be used." *Id.* at 1075 (quoting 41 U.S.C. § 8303(a)). Although the parties' contract was for construction of a public work, they did not include this mandatory construction clause and instead incorporated a less demanding clause applicable to supply contracts. *Id.* at 1073. The supply contract clause allowed Amoroso to purchase foreign-made steel for the project, but the Army Corps insisted that Amoroso comply with the construction clause and use only American-made steel, at an extra cost of $363,250. *Id.* at 1073–74. Amoroso filed a claim with the Court of Federal Claims to

---

[2] The Buy American Act of 1933 is different from the Buy America Act of 1982 at issue in this case. The Buy American Act of 1933 limits the federal government's use of foreign products in the construction of all public buildings and public works. 41 U.S.C. §§ 8301–05. In contrast, the Buy America Act applies to only the construction of mass transportation systems, but extends to purchases made by third-parties using federal funds. 49 U.S.C. § 5323.

9

recover this overage. On appeal, the Federal Circuit denied the claim, applying the *Christian* doctrine to incorporate the construction clause into the parties' contract. *Id.* at 1076. The court reasoned that the Buy American Act contains a "deeply ingrained strand of public procurement policy" mandating that the construction clause be contained in all construction contracts for public buildings. *Id.* at 1077. Further, the court decided that Amoroso, who contracted directly with the federal government, "should have realized" or at least "had a duty to inquire" whether the construction clause applied. *Id.*

We decline to follow the *Christian* doctrine under the allegations before us. The originating purpose of the *Christian* doctrine was to hinder the ability of the executive branch and lower government officials to evade legislative enactments. *Christian*, 320 F.2d at 351, 160 Ct. Cl. at 67 ("Obligatory Congressional enactments are held to govern federal contracts because there is a need to guard the dominant legislative policy against ad hoc encroachment or dispensation by the executive. There is a comparable need to protect the significant policies of superior administrators from sapping by subordinates." (citation omitted)); *see Amoroso*, 12 F.3d at 1075 ("Application of the *Christian* doctrine turns . . . on whether procurement policies are being 'avoided or evaded (deliberately or negligently) by lesser officials.'" (quoting *Christian*, 320 F.2d at 351, 160 Ct. Cl. at 67)). To effectuate this goal, the *Christian* court determined that it was reasonable to impose a duty to discover legislative directives on potential government contractors. It held that "in the procurement field as in others, an authorized regulation can impose such peremptory requirements on federal officials and those who seek to enter into transactions with the Government." *Christian*, 320 F.2d at 351, 160 Ct. Cl. at 67.

The *Christian* doctrine was thus intended to apply to contracts between the federal government and government contractors, not to subcontracts. *See G.L. Christian*, 312 F.2d at

351, 160 Ct. Cl. at 62 (holding the *Christian* doctrine applies to "federal officials and those who seek to enter into transactions with the Government"); *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 780 (Fed. Cir. 1993) (applying the *Christian* doctrine to a contract between a federal government entity and a government contractor); *Amoroso*, 12 F.3d at 1077 (same); *SCM Corp. v. United States*, 645 F.2d 893, 904, 227 Ct. Cl. 12, 32 (1981) (same); *Schoenbrod v. United States*, 410 F.2d 400, 404, 187 Ct. Cl. 627, 634–35 (1969) (same); *see also* Vernon J. Edwards, *Mandatory Flowdown Clauses: Not Always Easy to Decipher*, 27 No. 2 Nash & Cibinic Rep. ¶ 8 (Feb. 2013) ("We are not aware of any case in which the '*Christian* doctrine' has been successfully invoked by the Government or a contractor to read a clause into a subcontract . . . and it appears to be a general belief among practitioners that the doctrine does not apply to subcontracts."); Brian A. Darst, *Subcontract Incorporation-by-Reference & Flowdown Clauses Under Federal Government Construction Contracts*, Briefing Papers No. 05-7 (June 2005) ("[T]he *Christian* Doctrine is *not applicable to subcontracts* and cannot be used to invoke or incorporate mandatory flowdown provisions that have been omitted from a subcontract.").

Indeed, we know of no cases, and Defendants do not cite any, where the *Christian* doctrine has been extended to subcontractors.[3] Government contractors have direct knowledge that they are contracting with the government and thus it is reasonable to require them to inquire

---

[3] We recognize that the District Court for the District of Columbia did apply the *Christian* doctrine to incorporate federal labor requirements into a subcontract between three hospitals and a health maintenance organization that held a primary contract with the United States Office of Personnel Management. *UPMC Braddock v. Harris*, 934 F. Supp. 2d 238, 259 (D.D.C. 2013) *opinion vacated sub nom. UPMC Braddock v. Perez*, 584 F. App'x 1 (D.C. Cir. 2014). That opinion was vacated on appeal after the Secretary of Labor announced a moratorium on the enforcement of the requirements at issue. *UPMC Braddock*, 584 F. App'x 1. In any event, the decision is not binding on us and it is distinguishable in that the requirements were directed explicitly at subcontractors. *See UPMC Braddock*, 934 F. Supp. 2d at 259. The BAA does not similarly impose obligations on subcontractors directly.

11

into applicable procurement requirements. *See Amoroso*, 12 F.3d at 1076 (finding government contractor "should have realized . . . and had a duty to inquire" whether a procurement clause applied); *see generally* Vernon J. Edwards, *Postscript: Applying the Christian Doctrine to Subcontracts*, 27 No. 9 Nash & Cibinic Rep. NL ¶ 46 (Sept. 2013) ("[A]ctual or imputed knowledge is an essential element of the *Christian* doctrine"). Subcontractors, on the other hand, cannot be presumed to have such knowledge since their contract is with the primary contractor, not the government. Applying the strictures of the *Christian* doctrine to subcontracts could therefore lead to an inequitable result by imposing federal procurement obligations on parties that do not even know they are contracting for government work.

Moreover, even if we were to assume that a federal procurement regulation could be read into a subcontract where the subcontractor *did know* that it was performing government work, we cannot infer that knowledge here. ELI's complaint does not allege that it knew the BAA applied to the CTA Project when it received the purchase orders or began manufacturing the air conditioning units. Suggesting the contrary, ELI contends that Defendants knew their subcontractors were subject to the BAA, but that nonetheless the purchase orders they issued to ELI did not reference the BAA. (Compl. ¶ 14; Resp. at 9.) ELI additionally claims that when Edwards' Vice President visited its manufacturing plant in Mexico, he did not tell ELI that the BAA prevented the air conditioning units from being manufactured there. (Compl. ¶¶ 39–40.)

Although Defendants dispute ELI's suggestion that it did not know the BAA applied to the CTA Project, (Reply at 2–3), the complaint does not explicitly allege otherwise. Defendants point to the allegations that ELI is a "premier" manufacturer of air conditioning units "built to spec"; ELI knew the units were to be manufactured for and delivered to the CTA; ELI knew that the CTA issued specifications for the air conditioning units; and that ELI confirmed with

12

Defendants that it was meeting the plans and specifications issued by the CTA. (*Id.*; *see* Compl. ¶¶ 7–10, 14, 15, 23.) But drawing all reasonable inferences in ELI's favor as we must at this stage, we cannot infer ELI's knowledge based on these allegations. Knowledge that the CTA, a municipal agency, was involved in the project is not notice that the project was federally funded. And it is only the use of federal funds that triggers application of the BAA, not the involvement of a local entity. *See* 49 C.F.R. § 661.5(a). Moreover, we have no reason to conclude based on the allegations before us that the "specifications" ELI reviewed referenced the BAA or otherwise notified ELI of the Act's requirements or applicability.

We recognize that Congress intended the BAA to promote American jobs, a purpose which ELI's manufacturing in Mexico hampers. As we have explained, however, the BAA does not outlaw all contracts for foreign-made products. Rather, it applies narrowly to exclude the use foreign components only in the construction of transportation systems funded by the federal government. As alleged, ELI's contract with Defendants does not fall under this narrow description, and Defendants have not cited any authority that compels us to find otherwise. Accordingly, we find that ELI pled an enforceable contract and deny Defendants' motion on the breach of contract claim.

## II. Equitable Claims

In addition to its breach of contract claim, ELI alleges that Defendants were unjustly enriched by withholding payment under the purchase orders, and are therefore liable to ELI in *quantum meruit*. (Compl. ¶ 75.) ELI also claims that the doctrine of promissory estoppel likewise prevents Defendants from avoiding payment for ELI's completed services. (*Id.* ¶¶ 78–83.)

Defendants argue that ELI cannot recover on either of these equitable claims because a plaintiff cannot recover in equity on illegal contracts. (Mot. at 8.) Since we have already determined that the contract between ELI and Defendants is not illegal as alleged, there is no need for us to address Defendants' argument at this time. Accordingly, Defendants' motion regarding ELI's equitable claims is denied.

## CONCLUSION

As discussed above, Defendants' motion to dismiss is denied. ELI may proceed with its breach of contract, *quantum meruit*, and promissory estoppel claims. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: June 2, 2015
       Chicago, Illinois